Richard PARKER, Plaintiff,

v.

TOWN OF SWANSEA,
et al., Defendants.

No. CIV.A. 01–10063–JGD.

United States District Court,
D. Massachusetts.

May 27, 2003.

Barry Ward, New London, CT, for Plaintiff.

William P. Breen, Jr., Murphy, Hesse, Toomey, and Lehane LLP, Quincy, MA, Douglas I. Louison, James W. Simpson, Jr., Merrick, Louison & Costello, Boston, MA, for Defendants.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*[1]

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, Richard Parker ("Parker"), has brought this action alleging that his constitutional and state law rights were violated on February 20, 1998 when he was shot a number of times by police following a car chase which resulted in his arrest. This matter is before the court on the motion of the Town of Somerset and Jeffrey Cote for summary judgment (Docket #45) and the motion of the Town of Swansea, William McGrath, Richard Roussel and Marc Haslam for summary judgment (Docket #48). As detailed herein, the motions are ALLOWED IN PART and DENIED IN PART as follows: Counts I and II (42 U.S.C. § 1983, and Mass. Gen. Laws ch. 12, § 11I)—motions of individual defendants for summary judgment are DENIED; Count IV (negligence) and Count V (42 U.S.C. § 1983)—motion of Town of Swansea for summary judgment is DENIED; Counts III (negligence) and Count VI (42 U.S.C. § 1983)—motion of Town of Somerset for summary judgment is ALLOWED; Count VII (assault and battery)—motions of the individual defendants for summary judgment are DENIED; Count VIII (malicious prosecution)—motions of the individual defendants for summary judgment are ALLOWED.

## II. STATEMENT OF FACTS

On the evening of February 19, 1998, Parker contends he drove his jeep from his home in New London, Connecticut to attend a concert at a club in Providence, Rhode Island. He discovered that the club was closed, and was traveling home when he got lost in Massachusetts. At approximately 12:20 a.m., Swansea Police Officer William McGrath allegedly observed Parker's jeep drifting between eastbound lanes and into a westbound lane on Route 6 in Swansea. During this "drifting," Parker allegedly crossed over the double yellow center line of the road, which is a civil motor vehicle violation in Massachusetts. Parker disputes that he was drifting between lanes.

According to Officer McGrath, Parker's erratic driving raised his suspicions so he activated his lights and siren to signal Parker to pull over. Parker seemed to comply, but, as Officer McGrath was exiting his vehicle, Parker abruptly drove off. Parker disputes that this first stop ever took place.

It is undisputed, however, that Officer McGrath pursued Parker. After driving approximately 50–80 yards from the site of the alleged initial stop, Parker pulled over. Officer McGrath pulled his car alongside and slightly to the front of the driver's side of Parker's jeep. Parker contends that while he was waiting for Officer McGrath to approach his vehicle, a second Swansea police car driven by Swansea Police Officer Marc Haslam approached the scene traveling at a rapid speed. According to Parker, Officer Haslam's driving was "out of control" and he almost hit a mailbox. While the Swansea defendants dispute this description of Officer Haslam's driving, it is undisputed that he joined Officer McGrath at the stop, pulling in behind Parker's jeep. It is also undisputed that after Officer McGrath exited his cruiser, Parker drove away, fleeing on to Route I–195 eastbound.

1. The parties consented to transfer the case to this court for all purposes, including trial and the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

## The Motor Vehicle Pursuit

After Parker fled, Officers Haslam and McGrath followed him onto I–195, accessing the highway via exit 3. At this point, Parker and the Swansea officers were approximately one mile from Somerset. Swansea Officer Richard Roussel joined the chase, as did Somerset Police Officer Jeffrey Cote.

Somerset Officer Cote, acting as a back up, traveled behind the three Swansea cruisers, which were each traveling approximately 65–75 mph. Officer Roussel's car was directly in front of Parker's jeep, Officer McGrath was on Parker's right, and Officer Haslam was directly behind Parker. This configuration is known as a "rolling road-block" or a "box-in." Parker contends that the use of this technique violated Swansea's written policies for high speed pursuits. The police contend that Parker attempted to ram their cruisers during this chase, which Parker denies.

The vehicles remained in this "box-in" formation until they arrived at the Braga Bridge, which is located near exit 10. At that point, a disabled vehicle in the roadway forced the cars into a single file line. In addition, Fall River Police Officer Brian O'Hearn, who had received word of the chase, attempted to stop Parker by obstructing the roadway with his cruiser and aiming his firearm at Parker as Parker approached. Parker managed to escape through a small opening in Officer O'Hearn's roadblock.

Shortly thereafter, around exit 10 which accesses Route 88, Swansea's Sergeant Sadler who had been supervising the pursuit and knew multiple cruisers were involved, was informed by the officers that the vehicles were traveling at approximately 75 mph. He ordered the officers to stop the chase because the offenses for which they were following him were "[j]ust motor vehicle" offenses. At that point, all

the officers complied and turned their sirens and blue lights off while slowing down in preparation for taking exit 10. However, Parker suddenly cut across the highway and took exit 10 himself. According to Parker, he chose to exit the highway at that point because it was the first time the police had slowed down and given him room to move.

As Parker was taking the exit, he lost control of his jeep and went off the road, hitting a tree and landing in a ditch. Parker asserts that smoke started coming out of his engine after he crashed.

## The Post–Pursuit Shooting

All four police cars also took exit 10 and stopped near the crash site. It is undisputed that Officer Roussel immediately approached Parker's jeep by "walking quickly" with his flashlight in one hand and his service firearm in the other. The subsequent events are much in dispute. The Swansea defendants assert that as Roussel approached the jeep, he commanded Parker to stay in the vehicle and put his hands out the window. The defendants also assert that Parker briefly complied and put one hand out the window before quickly retracting it. Parker denies ever hearing these commands and denies putting his hand out the window.

According to the defendants, Parker then exited the driver's side of his jeep in a "combat crouch" shooting stance directed towards the officers with his hands clasped together in front of him at waistband level. Parker was wearing black weight lifting gloves with the fingertips cut off when he exited the jeep. The defendants assert that as Officer Roussel approached Parker, Parker raised his hands to shoulder level in Roussel's direction while still clasped together.

Officer Roussel claims that he thought Parker was pointing a gun at him and, therefore, "began squeezing the trigger" of his own gun. After shooting at Parker, Officer Roussel dove to his right and rolled to the right behind the rear of the jeep, dropping his flashlight. This allegedly caused the other officers to think that Officer Roussel had been shot, and they began firing at Parker as well. The officers contend that Parker did not go down immediately, and continued to act in a threatening manner and advance towards them, so they kept shooting. The defendants contend that the officers repeatedly told Parker to get down and place his hands up over his head, but to no avail. Parker denies hearing any such commands.

Massachusetts State Police ballistics testing conclusively determined that the police officers fired a total of forty-nine shots at Parker. Of these, twenty eight were attributed to Rousel, seven to Haslam, eleven to McGrath, and three to Cote. The testing was unable to determine from which firearm a fiftieth round was fired. According to Parker's doctors, between six and eight of these bullets struck Parker. These shots hit him in the foot, four places in his legs, his penis, and his abdomen.

For the most part, Parker disputes the defendants' account of events and asserts that he got out of the jeep because he was scared of the smoking engine. He also asserts that prior to exiting the jeep, he did not hear any commands. He contends that when he got out he was not in a crouch and that he had his hands out in front of him with his palms facing out because he was attempting to surrender. Parker asserts that he put his hands up in the air above his head upon hearing the first shot. Parker also maintains that, although he had his hands palms out in front of him when he got out of the jeep, he was soon shot in the finger and grabbed the injured finger tightly. According to Parker this is when the officers began "shooting [him] everywhere."

Parker denies ever pointing his finger at the officers as if he was holding a gun, and maintains that during the shooting he shouted to the police that he did not have a gun.

Parker finally returned to the ditch area near his jeep and collapsed on the ground. The defendant officers, accompanied by officers from other departments, then converged on Parker and handcuffed him. It is undisputed that while they were handcuffing Parker they repeatedly asked him where the gun was that he had been holding. The defendants contend that Parker responded by saying that he did not really have a gun but wanted the officers to believe that he did so they would be scared and retreat. Parker denies making any such statements. Rather, Parker asserts that he consistently maintained that he did not have a gun and told this to everyone that asked him. The police searched the area for the gun but found none. Parker was taken by ambulance, and then helicopter, to the hospital where he was listed in critical condition.

### The Charges Against Parker

The Swansea Police Department initiated seven formal charges against Parker: three counts of assault with a dangerous weapon, to wit a motor vehicle; resisting arrest; failure to stop for the police; operating a motor vehicle so as to endanger the public; and failure to keep within marked lanes (a civil infraction). After pleading guilty to the failure to stop and driving to endanger counts, Parker received a three month suspended sentence and was assessed a $100 fine. The state court dismissed the remaining charges over the District Attorney's objections.

Additional facts will be provided below where appropriate.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, ... would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted).

To prevail on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal citations and quotations omitted).

### B. *Civil Rights Violations*

In Count I, Parker alleges that the defendant officers violated his Fourth Amendment right to be free from the use of excessive force in connection with his arrest,[2] and that the individual defendants consequently are liable under 42 U.S.C. § 1983. In Count II, Parker contends that the same conduct violates the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (the "MCRA"). The officers, however, contend that they are protected by the doctrine of qualified immunity. As detailed herein, there are disputed facts which preclude the entry of summary judgment on this issue, and the defendants' motions for summary judgment as to Counts I and II are denied.[3]

Pursuant to 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the

---

**2.** While he purports to assert other constitutional violations in his complaint, Parker has not pursued these claims in his opposition to the motions for summary judgment. Therefore, these claims are waived. *See, e.g., Kelley v. LaForce,* 288 F.3d 1, 9 (1st Cir.2002) (arguments not briefed are waived); *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000) (once the moving party has met its burden of informing the court of the basis for its motion, the burden shifts to the opposing party to demonstrate that a trier of fact reasonably could find in his favor).

**3.** The "same qualified immunity standard that applies under § 1983 has also been held to

apply to claims under the MCRA." *Kelley v. LaForce,* 288 F.3d at 10 (citing *Duarte v. Healy,* 405 Mass. 43, 46, 537 N.E.2d 1230, 1232 (1989)). The disputed facts which preclude the entry of summary judgment on the § 1983 claim against the individual defendants similarly preclude the entry of summary judgment on the MCRA claim. Additionally, no MCRA claim can be asserted against the Towns for the simple reason that "a municipality is not a 'person' covered by the Massachusetts Civil Rights Act (MCRA), G.L. c. 12, §§ 11H, 11I." *Howcroft v. City of Peabody,* 51 Mass.App.Ct. 573, 591–92, 747 N.E.2d 729, 744 (2001) (quotation in original).

District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law . . .; second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores*, 103 F.3d 1056, 1061–62 (1st Cir.), *cert. denied*, 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997), and cases cited. Even where there has been a constitutional violation, however, " '[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Tower v. Leslie–Brown*, 326 F.3d 290, 296 (1st Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The determinative issue is "whether an objectively reasonable official would have believed that his conduct was lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *Kelley v. LaForce*, 288 F.3d at 6 (internal citations and quotations omitted). The officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).[4] The "Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir.1994).

The parties agree that where, as here, an excessive force claim arises in the context of an arrest, it involves the protections of the Fourth Amendment which guarantees citizens the right "to be secure . . . against unreasonable . . . seizures" of their person. *Graham v. Connor*, 490 U.S. at 394, 109 S.Ct. at 1871. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. at 1871 (internal citation and quotation omitted). It is a "fact-intensive inquiry that is highly sensitive to the circumstances of the particular case[.]" *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 147–48 (1st Cir.2003). *See also Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir.1997) (determining whether an objectively reasonable officer would understand that the challenged conduct was unreasonable is a highly fact specific inquiry; summary judgment is inappropriate where material facts are in

**4.** It is undisputed that the "plaintiff has alleged a deprivation of a constitutional or federal right by the defendant official[s]" and that "that right was clearly established at the time of the . . . alleged violation." *Kelley v. LaForce*, 288 F.3d at 6 (internal citations and quotations omitted). Since this prong of the analysis is easily met, the court will focus on the next inquiry which is "whether an objectively reasonable official would have believed that his conduct was lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *Id.* (internal citation and quotation omitted).

dispute). Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 148–49 (quoting *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1872). Moreover, in the Fourth Amendment context, and "under clearly established law, the use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians." *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 2003 WL 21012641, at *8 (citing *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985)).

■ "When a defendant moves for summary judgment on qualified immunity grounds, 'we must credit the plaintiff's version of defendants' actions to the extent that plaintiff has appropriately supported his version.'" *Sheehy v. Town of Plymouth*, 191 F.3d 15, 22 (1st Cir.1999) (quoting *Amsden v. Moran*, 904 F.2d 748, 752–53 (1st Cir.1990)). The facts alleged by Parker are sufficient to satisfy the "threshold question" of whether "the facts alleged show the [officers'] conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). These facts also raise a dispute as to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. at 2156. Consequently, summary judgment is not warranted in this case.

For example, but without limitation, according to Parker he exited the jeep with his arms extended and palms facing out while trying to surrender. Parker also maintains that he did not clasp his hands together until after the officers opened fire on him and a bullet struck his finger.

Further, he denies pointing his finger at the police or otherwise acting to create the impression that he had a gun. Thus, according to Parker he did not pose a threat warranting the use of deadly force, and it was unreasonable for the police to conclude otherwise.

Additionally, assuming, *arguendo*, the officers acted reasonably in firing the initial shots at Parker, under Parker's view of the incident a jury could find that the officers were not justified in continuing to shoot at him. *Cf. Napier v. Town of Windham*, 187 F.3d 177, 185–87 (1st Cir. 1999) (analyzing each series of shots separately). At his deposition, Parker testified that he shouted to the police that he did not have a gun, put his hands up after the first shot was fired, was hopping around on one foot after being shot in the other foot, and that at one point, he was crouched over in pain due to the gun shot wounds. These facts indicate that the police may not have continually assessed whether, and to what extent, Parker constituted a threat. Under these facts, Parker has sufficiently alleged a constitutional deprivation. Moreover, he has raised a factual dispute which precludes this court from finding, as a matter of law, that an objectively reasonable, similarly situated officer would not have understood that he was violating Parker's constitutional rights. *See, e.g., Kelley v. LaForce*, 288 F.3d at 8–9 (summary judgment denied where there was "a material factual dispute as to whether the defendants' conduct was reasonable so as to entitle them to immunity"); *Sheehy v. Town of Plymouth*, 191 F.3d at 23 (disputed facts precluded summary judgment on issue of qualified immunity); *Swain v. Spinney*, 117 F.3d at 10 (where there are disputed facts which relate to reasonableness and qualified immunity, summary judgment must be denied). For these reasons, the individual

defendants' motions for summary judgment as to Counts I and II of the complaint are denied.

### C. *Municipal Liability*

In Counts V and VI Parker alleges that the Towns of Swansea and Somerset, respectively, violated § 1983 by failing to train the defendant officers properly, including, without limitation, failing to train them properly on the use of deadly force, on the procedures for removing a potentially armed suspect from a vehicle, on the proper techniques for motor vehicle pursuits, and on how to prevent similar incidents. A "municipality enjoys no immunity from damages liability under § 1983." *Fletcher v. Town of Clinton*, 196 F.3d 41, 55 (1st Cir.1999). However, both municipal defendants contend that these claims fail since Parker has not produced any evidence of an unconstitutional custom or policy attributable to the Towns. While the question is a close one, for the reasons detailed herein Somerset's motion for summary judgment on this claim is allowed, while Swansea's is denied.

The basic standards for municipal liability is well settled. A "municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978)) (emphasis in original). The "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. at 388, 109 S.Ct. at 1204. Here, Parker has alleged that the municipal de-

fendants failed to train its officers on the proper use of deadly force. On its face, this states a claim against the towns. As the *Canton* Court stated as an example of conduct which may support a finding of deliberate indifference on the part of policymakers:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference."

*Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10. However, even where inadequate training is established, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391, 109 S.Ct. at 1206. *Accord Swain v. Spinney*, 117 F.3d at 11 (quoting *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997)) (discussing standards of municipal liability).

As a general rule, "a 'single incident' of police misconduct does not, standing alone, permit an inference of a policy of inadequate training." *Kibbe v. City of Springfield*, 777 F.2d 801, 805 (1st Cir. 1985), *cert. dismissed*, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293, *reh'g denied*, 481 U.S. 1033, 107 S.Ct. 1966, 95 L.Ed.2d 537 (1987). However, where there is "evidence that the officers were trained to act recklessly in a manner that created a high risk of death" and that the officers acted consistently with their training, a jury could find that "the need for different training was so obvious and the inadequa-

cy so likely to result in violation of constitutional rights that the policymakers of the City could reasonably be said to have been deliberately indifferent to the need." *Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 844 (10th Cir.1997) (issues of material fact precluded summary judgment for city in § 1983 claim of inadequate training based on shooting of mentally ill or emotionally upset, armed, individual), *cert. denied,* 522 U.S. 1148, 118 S.Ct. 1165, 140 L.Ed.2d 176 (1998). *Accord Kibbe v. City of Springfield,* 777 F.2d at 806 n. 4 (a complete failure to train or training in a "reckless or grossly negligent manner so that future police misconduct is almost inevitable" states a claim for municipal liability under § 1983) (internal citation omitted). That is the situation alleged in the instant case with respect to the Town of Swansea.

■ There is deposition testimony by Officer Haslam that in rushing Parker's vehicle Officer Roussel was acting in accordance with the training the Swansea officers received. In fact, Officer Haslam testified that he would have done the same thing. A jury could find that the use of this technique would lead to an inevitable confrontation and greatly increase the likelihood that deadly force would be used against unarmed individuals, such as Parker. A jury could also conclude that there were alternatives which could, and should, have been implemented which would have prevented this shooting, and that the officers should have been trained in these alternative methods. *See Kibbe v. City of Springfield,* 777 F.2d at 807–08. This is sufficient to create a genuine issue of material fact as to whether the Swansea officers were inadequately trained, and whether a different method of training was obviously needed. Therefore, Swansea's motion for summary judgment on the issue of municipal liability is denied. *See Paul v. City of Altus,* 141 F.3d 1185, 1998 WL 94606, at * 2–3 (10th Cir.1998) (unpublished op.) (summary judgment denied where the evidence showed inappropriate training in method of arrest and multiple officers testified that the unlawful technique was consistent with their training).

■ However, the facts relating to the Town of Somerset are different. The record does not reveal that Officer Cote's actions amounted to more than an isolated incident. Officer Cote was the only Somerset officer involved and nothing indicates that his actions, if improper, were the result of any policy, custom, or failure to train. There is also no evidence that any other members of the Somerset Police Department either acted in similar ways or were trained to do so.

Moreover, there is no evidence that Somerset consciously decided not to provide appropriate training. Despite Parker's assertions to the contrary, the record indicates that Officer Cote received training in firearms, in assessing threats, and on when to use deadly force. In addition, the standard that he was trained to apply in connection with the use of deadly force, according to Officer Cote's description, was consistent with that set forth in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Therefore, Somerset's motion for summary judgment as to Count VI of the complaint is allowed

### D. *Negligence*

■ In Counts III and IV of the complaint, Parker claims that the Towns of Somerset and Swansea, respectively, are liable under Mass. Gen. Laws ch. 258, § 2 (the Massachusetts Tort Claims Act) for negligently failing to train their officers. For the reasons detailed herein, Somerset's motion for summary judgment on this claim is allowed, while Swansea's is denied.

The difference, "if any, between negligence required for recovery under [Mass.]

G.L. c. 258, and deliberate indifference required under 42 U.S.C. § 1983" is not well defined. *Bannister v. Commonwealth*, 411 Mass. 130, 132, 579 N.E.2d 163, 165 (1991). In the Town of Somerset's case, however, there is no evidence rebutting the fact that its officers received all state-mandated training, and that the training that was received was consistent with constitutional principles. "While compliance with a statute or regulation is not conclusive evidence in itself of due care, it is properly viewed as prima facie evidence of due care .... Hence, in the absence of any evidence offered by [Parker] that the Town failed adequately to train its officers ..., and in the face of evidence of the officer's training ... in compliance with ... the requirements of state statutory regulations, [Parker] fails to show a breach of any duty of the Town." *Rochleau v. Town of Millbury*, 115 F.Supp.2d 173, 179 (D.Mass.2000) (internal citations omitted). Moreover, the decision to provide additional training may be a discretionary act for which the Massachusetts Tort Claims Act provides immunity. *Id.* at 179–80. For these reasons, the Town of Somerset's motion for summary judgment on Parker's negligence claim is allowed.

■ In connection with the Town of Swansea, however, as detailed above there is evidence that the officers were trained inconsistently with approved procedures. Having affirmatively undertaken this additional training, Swansea may be liable for negligently failing to train its officers properly. These disputed facts mandate the conclusion that the motion of the Town of Swansea for summary judgment on the negligence claim be denied.

### E. *Assault and Battery*

■ In Count VII, Parker alleges that the defendant officers are liable for assault and battery due to their conduct during his arrest. Only the Swansea defendants have moved for summary judgment on this claim, contending that because they were acting as peace officers and in self defense, they were privileged to use the force they exerted to consummate Parker's arrest. Given the material facts in dispute in this case, the motion for summary judgment on this count is denied.

Assault and battery is the "intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *Jesionowski v. Beck*, 937 F.Supp. 95, 105 (D.Mass.1996); *accord Noel v. Town of Plymouth*, 895 F.Supp. 346, 354 (D.Mass.1995) (both quoting *Commonwealth v. McCan*, 277 Mass. 199, 203, 178 N.E. 633, 634 (1931)). "[A]n officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest." *Julian v. Randazzo*, 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980); *accord Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir.1991) (internal citation and quotation omitted). The standard for determining whether force is reasonable for assault and battery claims is "essentially the same" as the standard for determining if force is reasonable for Fourth Amendment excessive force claims. *Id.* Thus, when a plaintiff alleges both a Fourth Amendment excessive force claim and an assault and battery claim in the same complaint, the constitutional claim and the common law claim "rise or fall in the same manner." *Jesionowski v. Beck*, 937 F.Supp. at 105.

As detailed above, there are disputed facts which preclude this court from ruling, as a matter of law, on the issue whether the force used was reasonable under the Fourth Amendment. For the same reason, the motion for summary judgment on

the assault and battery claim must be denied.

### F. Malicious Prosecution

In Count VIII of the complaint, Parker alleges that the individual Swansea defendants, Officers McGrath, Roussel and Haslam, are liable for the tort of malicious prosecution.[5] The defendants contend that they had probable cause to arrest Parker, and he pleaded guilty to some of the charges against him, thereby precluding a claim of malicious prosecution. This court agrees that Parker has failed to state a claim for malicious prosecution, and the motion for summary judgment as to Count VIII is allowed.

 "In an action for malicious prosecution, a plaintiff must establish that the criminal action was brought maliciously, without probable cause, and has been terminated in favor of the plaintiff." *Wynne v. Rosen*, 391 Mass. 797, 798, 464 N.E.2d 1348, 1350 (1984) and cases cited. Thus, as a general rule, a claim of malicious prosecution cannot stand where there was probable cause for the arrest. *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 405–06, 772 N.E.2d 552, 562 (2002), and cases cited. In the instant case, Parker was charged with three counts of assault with a dangerous weapon, to wit a motor vehicle; resisting arrest; failure to stop for the police; operating a motor vehicle so as to endanger the public; and failure to keep within marked lanes. He pleaded guilty to the failure to stop and driving to endanger counts, and admits that there was probable cause to arrest him on those charges. It is Parker's contention, however, that there was no probable cause to arrest him for the assault with a dangerous weapon charges, and his malicious prosecution claim is premised on those charges.

Parker cites no cases to support his contention that probable cause must exist for all charges eventually brought in order to defeat a malicious prosecution claim. In the context of qualified immunity, the First Circuit has recognized the "related crimes defense" which holds that "even where there is no probable cause to arrest the plaintiff for the crime charged, proof of probable cause to arrest the plaintiff for a related offense is also a defense which may entitle the arresting officer to qualified immunity." *Sheehy v. Town of Plymouth*, 191 F.3d at 19 (quoting *Avery v. King*, 110 F.3d 12, 14 (6th Cir.1997)). To qualify as a "related offense" "the crime with which the arrestee is charged and the crime offered to the court as a justification for the arrest must relate to the same conduct" and "the two crimes must share similar elements or be directed generally at prohibiting the same type of conduct." *Sheehy v. Town of Plymouth*, 191 F.3d at 19–20. In the instant case, the charges of driving to endanger and failing to stop relate to the same conduct as the assault and battery with a dangerous weapon (a car) charges and the crimes share similar elements. Under the facts of this case, they are related crimes, and the existence of probable cause for the arrest on the charges to which Parker pleaded guilty precludes his malicious prosecution claim.

---

**5.** Although the Town of Somerset and Officer Cote address the malicious prosecution claim in their motion for summary judgment, this count of the complaint is not directed against them. In his opposition, Parker admits that he does not have a claim for malicious prosecution against Officer Cote, but does contend that he has a claim for abuse of process against Officer Cote. However, there is no abuse of process claim in the complaint, and Parker has not sought leave to file such a claim. As there is no abuse of process claim at issue in this litigation, it will not be addressed herein.

■ The defendants are entitled to summary judgment on this count for the additional reason that the criminal prosecution did not conclude in Parker's favor. Only after Parker pleaded guilty to the driving to endanger and failure to stop charges were the assault and battery charges dismissed. Under the facts presented here, "[s]uch a compromised dismissal does not constitute a favorable termination of the criminal proceedings." *Simmons v. City of Brockton,* Civ. A. No. 93–12201–RWZ, 1994 WL 725181, at *1 (D.Mass. Dec. 15, 1994) (criminal case dismissed only after defendant stipulated that she would not run an illegal boarding house in the future; malicious prosecution claim dismissed as there was no favorable termination of the criminal proceedings), and cases cited. The dismissal of some of the charges against Parker, which was based on his plea to related charges, does not evidence Parker's innocence of the dismissed charges, but rather constitutes a compromise of the type which the system encourages to resolve a busy docket. Under such circumstances, "an action for malicious prosecution would be barred because the action of the accused is inconsistent with innocence." *Wynne v. Rosen,* 391 Mass. at 801, 464 N.E.2d at 1351. The motion for summary judgment as to Count VIII is allowed.

## IV. *CONCLUSION*

For all the reasons herein, the motions for summary judgment are ALLOWED IN PART and DENIED IN PART as described above.